# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| **TERESA M. JOHNSTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CAUSE NO. 1:09-CV-00003** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Teresa Johnston appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Johnston applied for DIB on May 16, 2005, alleging that she became disabled on January

28, 2005. (Tr. 71-74.)  The Commissioner denied her application initially and upon

reconsideration, and Johnston requested an administrative hearing. (Tr. 40-52.)  On May 16,

2008, Administrative Law Judge (ALJ) Yvonne Stam conducted a hearing at which Johnston

(who was represented by counsel), her sister, and a vocational expert testified. (Tr. 491-514.)

On May 28, 2008, the ALJ rendered an unfavorable decision to Johnston, concluding that

she was not disabled despite the limitations caused by her impairments because she could

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

perform some of her past relevant work, as well as a significant number of other jobs in the economy. (Tr. 12-22.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-8.)

Johnston filed a complaint with this Court on January 5, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Johnston alleges two flaws with the Commissioner's final decision–that the ALJ improperly evaluated her credibility and her mental limitations. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 14-17.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Johnston was forty-nine years old; had obtained her GED; and possessed work experience as a fast food assistant manager, parts inspector, injection mold machine operator, motor home finish inspector, receptionist, and warranty clerk. (Tr. 68, 78, 131, 493-94.) Johnston alleges that she became disabled due to the following impairments: chronic fatigue syndrome, antiphospholipid syndrome,[3] post-Harrington rod replacement 1979, post-cervical surgery 1989, intracranial lesions, scoliosis, lumbar spondylosis, marked left L5-S1 neuroforaminal stenosis, major depression, mood disorder due to a general medical condition, and anxiety disorder. (Opening Br. 2.)

At the time of the hearing, Johnston lived "off and on" with her two teenage children because she was presently going through a divorce. (Tr. 495.) She stated that she could not work

---

[2] The administrative record in this case is voluminous (514 pages). Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Antiphospholipid syndrome "consists of thrombosis . . . associated with various autoimmune antibodies directed against one or more proteins . . . ." THE MERCK MANUAL 1082 (Mark H. Beers, ed., 18th ed. 2006). "Heparin, warfarin, and aspirin have been used for prophylaxis and treatment." Id.

due to pain, severe fatigue, and "being unable to think straight", which cause her to stay in bed at least two days every week. (Tr. 497, 499.)  She elaborated that her pain "moves around" in her body but that her back hurts constantly, rating the pain as a "five" on a scale of "one" to "ten". (Tr. 498.)  Johnston also testified that her anxiety and depression prevent her from working, relaying that she feels her brain is "empty" or in "slow motion". (Tr. 498-99.)

On a "good day", Johnston states that she forces herself to get up and "do a little bit of something", but that she still has to lie down and rest intermittently throughout the day because of her pain. (Tr. 497-98.)  She explained that when her husband lived with her he assumed many of the household chores, such as grocery shopping and cooking, because she often felt "useless". (Tr. 500-01.)  Nonetheless, she did report that she shops occasionally and drives two to three times a week, going to her church, stores, or appointments. (Tr. 500-01.)  As to her physical capacity, Johnston stated that she can stand for fifteen minutes; on "good days" walk for thirty minutes; and lift ten pounds. (Tr. 500.)  She complained of experiencing certain side effects, such as nausea and headaches, from her medications. (Tr. 501.)

*B.  Summary of the Medical Evidence*

On April 30, 2004, Johnston consulted Dr. Jody Neer, a necrologist, for visual disturbance, headache, and facial numbness. (Tr. 488.)  After an MRI, he determined the visual disturbance was of unclear etiology and that the facial numbness was likely related to a focal brain abnormality in the right hemisphere. (Tr. 488.)  Johnston saw Dr. Neer two times in June 2004, and based on the results of further laboratory studies, he referred her to a rheumatologist. (Tr. 487.)

On July 15, 2004, Johnston was evaluated by Dr. David Campbell, a rheumatologist. (Tr.

485.)  He noted her subjective complaints of hearing problems, double vision, loss of smell, difficulty swallowing, nausea, depression, and Raynaud's events; and her past medical history, which included chronic fatigue, weakness, surgical history of Harrington rod replacement in 1979, and cervical surgery for a pinched nerve in 1989. (Tr. 485.)  The results of her physical exam, however, were essentially normal. (Tr. 485.)  Dr. Campbell thought that she might have antiphospholipid antibody syndrome, but not lupus. (Tr. 486.)

Johnston returned to Dr. Neer on August 27, 2004, reporting that her headaches were not severe and that her left facial numbness was intermittent. (Tr. 484.)  Although she occasionally saw bright flashing lights, she had no weakness or numbness. (Tr. 484.)  Her most recent MRI showed no significant change and her other tests were normal. (Tr. 484.)  He prescribed medication for her back pain and headaches. (Tr. 484.)

On October 28, 2004, Johnston visited Dr. Ronald Williams, a neuropsychologist, for evaluation of some mild memory problems, depression, and extreme fatigue. (Tr. 480-82.)  She reported that the treatment for her headaches was successful but that her main problem was extreme fatigue. (Tr. 480.)  She had been missing about one day of work a week, and her job was in jeopardy. (Tr. 480.)  Tests for multiple sclerosis and lupus were negative. (Tr. 480.)  He explained that chronic fatigue can be a manifestation of depression and recommended that she continue taking an anti-depressant. (Tr. 481.)  Because she did not have any cognitive complaints, he thought neuropsychological testing was unnecessary. (Tr. 482.)

On March 3, 2005, Johnston returned to Dr. Campbell. (Tr. 441.)  He found no sign of inflammatory arthritis but did find evidence of anticardiolipin antibody syndrome. (Tr. 441.)  One month later Johnston was evaluated by Dr. Anne Greist for complaints of severe fatigue.

(Tr. 360-62.) She assessed Johnston's coagulation status and the possibility of a genetic disorder, finding her muscle strength and reflexes within normal limits. (Tr. 361.) Subsequent blood tests were generally within normal limits and were not particularly suggestive of antiphospholipid syndrome. (Tr. 354-59.)

On August 15, 2005, Johnston underwent a physical examination by Dr. Venkata Kancherla at the request of the Social Security Administration. (Tr. 341-43.) He found her gait, muscle strength, reflexes, and sensation were normal. (Tr. 342.) Overall, the physical examination findings were unremarkable, except for decreased spinal range of motion. (Tr. 342-43.) Dr. Kancherla noted that Johnston had a history of Epstein-Barr virus and depression. (Tr. 343.)

A few days later, Johnston was seen by Barbara Gelder, Ph.D., at the request of the Social Security Administration. (Tr. 344-45.) She rated Johnston's current level of depression as a "seven" on a scale of "one" to "ten". (Tr. 344-45.) She diagnosed her with generalized anxiety disorder, depression, and nicotine dependence, and assigned her a current Global Assessment of Functioning ("GAF") score of 51, and a score of 53 for the past year.[4] (Tr. 348.)

In October 2005, Dr. F. Montoya, a non-examining state agency physician, found that she could lift twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour workday, and stand or walk for six hours in an eight-hour workday. (Tr. 312-19.) His opinion was later affirmed by a second state agency physician. (Tr. 319.) That same month, Dr.

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id.

J. Larsen, a non-examining state agency psychologist, concluded that Johnston could perform simple, repetitive tasks on a sustained basis without special considerations. (Tr. 322-37.) He indicated that at certain times it might take Johnston longer to complete tasks. (Tr. 335-36.) His opinion was later affirmed by a second state agency psychologist. (Tr. 336.)

On December 7, 2005, Johnston saw Dr. Mark Schomogyi, an infectious disease specialist, concerning her complaints of chronic fatigue and Epstein Barr. (Tr. 241-43.) On physical exam, he found diffuse arthralgias and myalgias with some urinary incontinence. (Tr. 241.) He discussed the various causes of chronic fatigue with her and recommended that she undergo sleep apnea testing, which ultimately revealed no evidence of obstructive sleep apnea. (Tr. 233, 243.)

In January 2006, Johnston was seen three times by Dr. Rhonda Sharp. (Tr. 208-16, 235-36.) She found that Johnston could only occasionally lift and carry up to ten pounds; bend, reach above the shoulder, kneel, crawl, or climb stairs; and push or pull less than ten pounds. (Tr. 235.) Dr. Sharp assessed that Johnston had fatigue and depression and concluded that her functional ability was limited to one hour of sedentary activity during an eight-hour workday. (Tr. 215-16, 235-36.) Johnston saw Dr. Sharp several more times in 2006 for various complaints. (Tr. 210, 212, 214.)

On March 30, 2006, Johnston visited Dr. Campbell again for her fatigue and diffuse muscular pain. (Tr. 228-30.) She had full shoulder range of motion, but there were diffuse tender trigger points and hypermobility consistent with fibromyalgia or nonarticular rheumatism. (Tr. 229.) He diagnosed her with severe fibromyalgia with trigger points, muscle pain, stiffness, fatigue, and poor rest. (Tr. 229.) Dr. Campbell suggested that Johnston try to participate in an

6

aerobic exercise program such as walking, biking, or swimming. (Tr. 229.)

On July 13, 2006, Johnston underwent a functional capacity evaluation administered by a physical therapist. (Tr. 221-27.) The physical therapist concluded that Johnston could perform sedentary work. (Tr. 221.)

Johnston saw Dr. Frances Goff, a neuropsychologist, on February 12, 2007. (Tr. 203-05.) Intelligence testing showed that Johnston was functioning with an average to low average IQ, but memory testing indicated that she had an average to superior memory. (Tr. 204.) Dr. Goff concluded that Johnston's performance on the testing did not suggest significant cognitive dysfunctioning. (Tr. 205.) An MMPI-2 profile was considered invalid due to exaggeration of symptoms; De. Goff believed that Johnston likely exaggerated her symptoms to call attention to her emotional distress. (Tr. 205.) He recommended that she seek psychotherapy services at the Northeastern Center. (Tr. 205.)

In May 2007, Mark Denney, a marriage and family therapist, submitted a cursory letter to Johnston's attorney, reporting that he had been counseling Johnston for the past three months. (Tr. 185.) He noted that she had demonstrated some progress in therapy sessions but that she continued to have moderate to severe depression and low energy levels. (Tr. 185.) Mr. Denney opined that Johnston's situation appeared chronic with limited opportunity for improvement in her ability to work. (Tr. 185.)

On August 1, 2007, Johnston visited the hospital emergency room for stress and anxiety, and she was sent to the Northeastern Center for immediate consultation. (Tr. 193-94.) While in counseling there, Johnston reported some suicidal thoughts and was assessed to be in the moderate range of the suicide scale. (Tr. 173.) She was assigned a GAF score of 40 and

diagnosed with major depression, recurrent moderate; generalized anxiety disorder; and mood

disorder due to a general medical condition.[5] (Tr. 169.)  Johnston met with a Northeastern Center

counselor every two weeks from August 2007 through April 2008, and the records indicate that

her energy, mood, and coping skills all improved during that time. (Tr. 151-73.)  Nonetheless, in

February 2008, her current GAF was still rated at 42. (Tr. 156.)

On January 3, 2008, Johnston saw Dr. Campbell for another consultation. (Tr. 179-80.)

He noted that her mood seemed appropriate and that there were no emotional manifestations of

depression or anxiety. (Tr. 179.)  She had full shoulder range of motion and mild hypermobility;

his assessment was hypermobility syndrome and osteoarthritis. (Tr. 179.)  He reported that her

tender trigger points of fibromyalgia were fairly mild. (Tr. 180.)  He again encouraged her to

participate in an aerobic exercise program. (Tr. 180.)

In May 2008, Johnston saw Dr. Kachmann, a neurosurgeon, for complaints of back,

buttock, hip, and leg pain. (Tr. 138-39.)  He found that she had normal motor strength in her

lower extremities. (Tr. 139.)  A recent MRI showed some degenerative changes in her lower

spine, and he recommended that she undergo back surgery. (Tr. 139.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The

Court's task is limited to determining whether the ALJ's factual findings are supported by

---

[5]  GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). American Psychiatric Association, *supra* n.4.

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. §

404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.

*Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than

step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The

burden of proof lies with the claimant at every step except the fifth, where it shifts to the

Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On May 28, 2008, the ALJ rendered her decision. (Tr. 12-22.)  She found at step one of

the five-step analysis that Johnston had not engaged in substantial gainful activity since her

alleged onset date. (Tr. 14.)  At step two, she concluded that Johnston had the following severe

impairments: chronic fatigue, depression, anxiety, possible fibromyalgia, and back pain. (Tr. 14.)

The ALJ then at step three determined that Johnston's impairment or combination of

impairments was not severe enough to meet a listing. (Tr. 14.)  Before proceeding to step four,

the ALJ found Johnston's subjective complaints not entirely credible and assigned her an RFC

"to perform sedentary work . . . except that she cannot perform tasks that require a fast pace."

(Tr. 14, 19.)

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Johnston was able to perform her past relevant work as a parts inspector, receptionist, and warranty clerk. (Tr. 20.) The ALJ also continued to step five where she concluded that even if a limitation to simple, repetitive tasks was added to Johnston's RFC, she could still perform a significant number of other jobs in the economy, including waxer, table worker, machine operator, and clip loader. (Tr. 21.) Therefore, Johnston's claim for DIB was denied. (Tr. 21-22.)

### C. The ALJ's Credibility Determination Will Not Be Disturbed

Johnston first argues that the ALJ improperly evaluated her credibility. Specifically, she contends that when assessing her credibility, the ALJ failed to consider Dr. Campbell's March 2006 statement that the fatigue Johnston described is the type seen in severe fibromyalgia.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, in contrast to Johnston's assertion, the ALJ did not turn a blind eye to Dr. Campbell's March 2006 opinion. Rather, she penned an entire paragraph on it, summarizing Dr.

11

Campbell's physical examination findings, his diagnosis of fibromyalgia, and his belief that

Johnston needed to participate in an aerobic exercise program. (Tr. 17.) In fact, the ALJ also

penned a paragraph on Dr. Campbell's more recent January 2008 opinion, reflecting that

Johnston's physical examination results were mostly "unremarkable" and that her

"hyperflexibility was much less prominent than when she was last seen." (Tr. 18.) Thus, there is

no doubt that the ALJ certainly considered Dr. Campbell's opinions.

Nonetheless, Johnston seems to be contending that the ALJ erred by failing to

*specifically discuss* Dr. Campbell's statement in his March 2006 note that "[w]e frequently see

this kind of fatigue in severe fibromyalgia". (Tr. 229.) However, "an ALJ need not provide a

complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d

300, 308 (7th Cir. 1995). Here, the ALJ did indeed consider Dr. Campbell's opinion that

Johnston had fibromyalgia, and thus did "not ignore an entire line of evidence that is contrary to

the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Furthermore, the ALJ identified her chronic fatigue and fibromyalgia as severe

impairments at step two of the five-step analysis (Tr. 14), and she expressly acknowledged that

Johnston is moderately limited in her ability to perform daily activities due to her fatigue (Tr.

20). Thus, the ALJ certainly credited to some extent Johnston's complaints of fatigue, inactivity,

and pain. (Tr. 19.)

Moreover, the ALJ discounted Johnston's credibility for several reasons that Johnston

does not challenge, including that her physical examination findings were generally

unremarkable, there is only one report of significant hyperflexibility and diffuse tender trigger

points, and no evidence of muscle atrophy.[7] (Tr. 19.)  The ALJ also cited the fact that her MMPI-2 results were invalid due to her exaggeration of symptoms and that her high memory testing scores undermined her claim of memory and concentration difficulties. (Tr. 20.)

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and her conclusion that Johnston's testimony of debilitating limitations was not entirely credible, and her determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435.  Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### D.  The ALJ's Consideration of Johnston's Mental Limitations Is Supported by Substantial Evidence

Johnston next argues that the ALJ improperly evaluated her mental limitations when determining her RFC.  Though Johnston's argument is a bit hard to follow, she seems to argue in her reply brief that the ALJ erred when he relied upon the 2005 and 2006 opinions of the state agency physicians, who opined that she could perform simple, repetitive tasks on a sustained basis without special considerations, rather than the Northeastern Center counselors in 2007, who rated her GAF at 40.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical

---

[7] Although Johnston also initially challenged the ALJ's reasoning about the lack of evidence of any muscle atrophy, she conceded in her reply brief that this point is supported by substantial evidence. (Reply Br. 1.)

findings and not inconsistent with other substantial evidence in the record."[8] *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Furthermore, a claimant is not entitled to DIB "simply because a physician finds that the claimant is 'disabled' or 'unable to work'." *Clifford*, 227 F.3d at 870. The determination of disability is reserved to the Commissioner. *Id.*; *Diaz*, 55 F.3d at 306 n.2; *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006).

Here, the ALJ noted that there was a difference of opinion among the medical sources about the severity of Johnston's mental limitations. (Tr. 19-20.) In resolving this conflict and arriving at an RFC, the ALJ considered that Johnston's mental status examination findings were generally unremarkable and that she was described as demonstrating appropriate affect and normal cognition. (Tr. 26.) She further explained that Johnston's low average IQ scores and average to superior memory scores undermined any allegations of significant memory or concentration problems, and that her credibility was impacted by the invalid MMPI-2 profile. (Tr. 26.) The ALJ further considered the fact that Johnston had not received inpatient care for her psychological problems and that she did not seek regular counseling until August 2007, more than two years after her alleged onset date. (Tr. 26.) Finally, the ALJ observed that progress

---

[8] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

notes from the Northeastern Center indicate that Johnston's mental condition had improved as of

early 2008. (Tr. 20.)  Taking all of this evidence into consideration, the ALJ chose to rely more

heavily on the opinions of the state agency psychologists than those of Johnston's treating

counselors.

Johnston seems to suggest that the ALJ should not have relied upon the state agency

psychologists' opinions because these psychologists never reviewed the counselors' 2007

opinions. (Reply Br. 2.)  However, Johnston provides no legal explanation for why this results in

the ALJ's improper reliance on the state agency psychologists' opinions. *See generally* 20 C.F.R.

§ 404.1527(f)(2)(i) ("State agency medical and psychological consultants and other program

physicians and psychologists are highly qualified physicians and psychologists who are also

experts in Social Security disability evaluation."); *see, e.g.*, *Ottman v. Barnhart*, 306 F. Supp. 2d

829, 839 (N.D. Ind. 2004) (affirming ALJ's decision where he relied upon the state agency

psychologists' opinion, rather than an examining psychologist, concerning plaintiff's mental

limitations); SSR 96-6p.  Insofar as the state agency psychologists' opinions conflict with the

counselors' opinions, the ALJ is required to weigh conflicting evidence, ultimately deciding

which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v.*

*Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's

complaint that the ALJ gave greater weight to an earlier mental examination than to one

conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is

exactly what the ALJ is required to do").

And to the extent Johnston is arguing that the ALJ erred by failing to specifically

mention the GAF score of 40 assigned by the Northeastern Center counselors in 2007, as

explained earlier, "an ALJ need not provide a complete written evaluation of every piece of testimony and evidence." *Diaz*, 55 F.3d at 308.  It is clear that the ALJ did indeed consider the Northeastern Center's 2007 progress notes but determined for the foregoing reasons to rely more heavily upon the state agency psychologists' opinions, noting in particular the Northeastern Center's statement that Johnston was improving by early 2008.

In sum, the ALJ adequately evaluated Johnston's mental limitations and sufficiently explained her rationale for assigning the psychologists' and counselors' opinions the weight that she did, allowing this Court to adequately trace her path of reasoning with respect to the assignment of Johnston's RFC. *See Books*, 91 F.3d at 980.  Consequently, Johnston's second argument also does not merit a remand of the Commissioner's final decision.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Johnston.

SO ORDERED.

Enter for this 22nd day of December, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge